**UNITED STATES of America,**
Appellant,

v.

**HENDERSON CLAY PRODUCTS,**
Appellee.

No. 19471.

United States Court of Appeals
Fifth Circuit.

Oct. 25, 1963.

Rehearing Denied Dec. 30, 1963.

**8**

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept of Justice, Washington, D. C., William Wayne Justice, U. S. Atty., Tyler, Tex., Melva M. Graney, Robert L. Waters, Attys., Dept. of Justice, Washington, D. C., Lloyd W. Perkins, Asst. U. S. Atty., for appellant.

Benjamin L. Bird, Fort Worth, Tex., Chas. W. Shaw, Henderson, Tex., Robert B. Wallace, Corpus Christi, Tex., for appellee, Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., Waldrop, Shaw & Colley, Henderson, Tex., of counsel.

Before TUTTLE, Chief Judge, and WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

The problem this tax case presents is one of defining "gross income from mining" in determining the depletion allowance for an integrated miner-manufacturer of ball clay processed into bricks. The chief difficulty arises from the fact that although the first commercially marketable product of non-integrated clay miners is shredded ball clay having a market price of $10.50 a ton, the taxpayer sold its finished brick for only $8.75 a ton.

Section 23(m) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(m), established a deduction of a "reasonable allowance for depletion" of mineral resources, such allowance "to be made under rules and regulations to be prescribed by the Commissioner". Section 114(b) (4) (A) (iii) of the Internal Revenue Code of 1939 provides for a depletion allowance for clay of 15 per cent "of the gross income from the property", such allowance not to exceed 50 per cent of the net income of the taxpayer from the property. Subsection (B) defines "gross income from the property" as "gross income from mining". Mining includes "not merely the extraction" but also "the ordinary treatment processes [and minimum transportation] normally applied * * * to

obtain the commercially marketable mineral product". Gross income is further defined in Section 39.23(m)–1(e)(3) of Treasury Regulations 118. This regulation provides that when the mined product is processed or transported beyond those minima described in Section 114 (b)(4)(B), constructive gross income from the product is established by one of two methods. (1) The taxpayer takes the *"representative market or field price (as of the date of sale) of a mineral product of like kind or grade* as beneficiated by the ordinary treatment processes actually applied, before transportation of such product", and multiplies that price by the tonnage of minerals actually mined. (2) Or, if there is no such representative price for the depletable mineral product, the *proportionate profits method* is used to determine a constructive income from the property. This is the proportion of the sales price of the final product equalling the percentage which the costs of mining and processing the mineral bear to the total cost of producing the finished goods.

Henderson Clay Products, the taxpayer, is an integrated manufacturer: its production process includes all functions from the extraction of ball clay mined from its own pits near Henderson, Texas, to the conversion of the clay into finished bricks which the company sells throughout the country. The clay is strip-mined, by draglines or shovels, and hauled to the plant where it is crushed and shredded to manageable size, after which it is blended and ground to a uniform particle size. It is then transported to a pug mill where, mixed with water, the clay is formed into the shape of bricks, dried, burned in kilns, and shipped or stored for later shipment. None of it is sold in raw or semi-processed form. The per ton price for Henderson's finished brick averaged approximately $8.75 over this four year period.

For the fiscal years 1951–54, the taxpayer used the gross income from its finished brick as the basis for its depletion allowance.[1] The Commissioner challenged these returns and assessed deficiencies based on the proportionate profits method for determining percentage depletion. Henderson paid the deficiencies and filed suit for refund, contending that since brick was its first commercially marketable product, its gross income from mining was its gross income from the brick. See, for example, Cherokee Brick & Tile Co. v. United States, 5 Cir.1955, 218 F.2d 424; United States v. Merry Brothers Brick & Tile Co., 5 Cir.1957, 242 F.2d 708, cert. den'd 1957, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed. 2d 38.

During one of five continuances of the action,[2] the Supreme Court decided United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581. Cannelton holds that "ordinary treatment processes" are to be considered those applied by the ordinary non-integrated miner.[3] The depletion al-

---

1. During the fiscal years in question, the taxpayer mined 53,540.2 tons of clay in 1951; 51,755.9 tons in 1952; 53,699.3 tons in 1953; and 55,387.7 tons in 1954. Actual gross income from the sale of burnt brick was as follows: $468,094.11 in 1951; $465,668.33 in 1952; $482,-294.78 in 1953; and $520,684.56 in 1954. The reason for the discrepancy between $8.75 and the amount which results from dividing the dollar volume by the tonnage is that the tonnage figure refers to clay mined rather than to bricks sold.

 The taxpayer, in its returns, deducted 15 per cent of the gross income from sales of face brick for mineral depletion: $70,304.12 in 1951; $69,850.25 in 1952; $72,344.22 in 1953; and $78,-102.68 in 1954. The Commissioner determined that the proper depletion allowances would create the following income tax deficiencies: $29,844.92 in 1951; $38,460.94 in 1952; $32,228.49 in 1953; and $40,748.37 in 1954.

2. Three were sought jointly and one brought by each party individually. The purpose of these continuances was a continued attempt at settlement and a desire to await the decision of the Supreme Court in the Cannelton case which would have been dispositive of the question involved.

3. Congress has effectively removed the first commercially marketable product

lowance, therefore, should be based on the value of the mineral at the point where the non-integrated miner disposes of it and not on the value of the finished product; the integrated manufacturer "but sell[s] to himself the crude mineral that he mines". As succinctly stated in the recent case of Riddell v. Monolith Cement Co., 1962, 371 U.S. 537, 538, 83 S.Ct. 378, 9 L.Ed.2d 492, reversing 9 Cir., 301 F.2d 488, Cannelton held that "the statutory percentage depletion allowance should be cut off at the point where the mineral first became suitable for industrial use or consumption * * * namely, 'where the ordinary miner shipped the product of his mine.' "

Promptly after Cannelton was decided, the taxpayer amended its complaint. The amended complaint alleged, and the district court found, that there is a national market for shredded ball clay of like kind and grade to Henderson's clay at $10.50 a ton. Accordingly, the court held that the taxpayer was entitled to use the first method of constructing gross income, as set forth in Section 39.23(m)–1(e)(3) of Treasury Regulation 118. 199 F.Supp. 304. We reverse.

## I.

The disparity between the $8.75 price for Henderson's brick and the representative price of $10.50 for shredded ball clay, strange as it may seem, is explainable. There is substantial evidence in the record that in the relatively small national market for ceramic clay, as contrasted with the market for brick, the costs of advertising, management, and research, necessary to sell the clay, offset the higher price per ton it commands. One of the Government's own witnesses, the president of a clay mining company, and a forty-year veteran of the business,

testified that the price obtainable for clay bears no necessary relation to its quality; rather, the price is determined by "management, salesmanship, promotion, and usability of the material and the dependability of the producer." Henderson's secretary-treasurer and the general manager testified that Henderson did not attempt to sell clay because, being a young company, it was not prepared to install the extra equipment, processing, research, and engineering departments required in order to sell ball clay. It is not an unfair inference that Henderson found it more profitable and easier to sell brick for a smaller gross income per ton than to incur the expenses and increase the business complications involved in merchandising the clay on a nation-wide scale against experienced competitors.

■ Over 90 per cent of ball clay sold in the United States is mined in four counties in Kentucky and Tennessee. Henderson's witnesses testified that the taxpayer's clay had properties substantially similar to the Kentucky-Tennessee clays, that it was the equivalent in range and grade of qualities to the average clay from that area, and that it was extracted by mining techniques similar to those employed by the Kentucky-Tennessee miners. The Government's expert witnesses controverted some of this testimony. However, "[a]ll conflict between experts as to commercial identity of the product has repeatedly been held peculiarly a matter for the determination of the trier of fact." Riddell v. California Portland Cement Co., 9 Cir. 1962, 297 F.2d 345, 351. See also Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 621, 64 S.Ct. 724, 726, 88 L.Ed. 967.

Recognizing the difficulty in attacking on appeal the district court's factual determination, the Government challenges

test, now that it has been clarified by Cannelton. The Gore Amendments of 1960 have particularized those treatment processes which are to be treated as part of the mining operation. Section 613(c)(4) reads in part, "The following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to

to the ore or mineral in respect of which he is entitled to a deduction for depletion under Section 611: * * * (G) in the case of clay * * * crushing, grinding, and separating the mineral from waste, but not including any subsequent process * * *." 26 U.S.C.A. 613(c)(4) (G), Section 302(b) of P.L. 86–564, the Tax Rate Extension Act of 1960.

the finding on the ground that the court erred in assuming or finding that all ball clays are of "like kind and grade"; that since Henderson's shredded clay was not mined nearly as selectively as the Kentucky-Tennessee clay, it could not possibly be of like kind and grade to the clay mined by the Kentucky-Tennessee producers.

We are unable to accept this argument. It is premised on too narrow a construction of the phrase, "like kind and grade." The regulation speaks of "like" rather than "the same" or "identical".

In Alabama By-Products Corp. v. Patterson, 5 Cir. 1958, 258 F.2d 892, cert. den'd 1958, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303, the taxpayer, an integrated miner-manufacturer who would have gained a higher depletion allowance by using the proportionate profits method of determining basis rather than the representative field price, made an argument very similar to that advanced by the Government here. The company contended,

"that the phrase 'mineral product of like kind and grade' as used in Section 39.23(m)–1(e)(3) refers to mineral products with the same inherent attributes and characteristics as the depletable mineral in question. The taxpayer points to the many physical and chemical properties that distinguish kinds of coking coals. Coking coals differ as to volatile matter, ash content, carbon pickup, sulphur content, porosity, and phosphorous content. * * * The taxpayer argues therefore that none of the coking coal sold was of a 'like kind and grade' to the taxpayer's." 258 F.2d at 896–897.

In rejecting this argument, we held that

" 'like kind' is a broad phrase contemplating the distinction between classes of property (for example, personal and real) no matter how dissimilar they may be in location, in attributes, and in capacities for profitable use. [Citations omitted.] The District Court held, and we agree, that all bituminous coals are of like kind, or of the same general property classification.

"The phrase 'like grade', as it is used here, has not been interpreted. There is no indication that a narrow interpretation of this phrase was intended. Section 39.23(m)–7 of the Regulations indicates that a liberal interpretation was contemplated:

" '(a). If the fair market value of the property at a specified date is to be determined for the purpose of ascertaining the basis for depletion and depreciation deductions, * * * [t]he value sought should be that established assuming a transfer between a willing seller and a willing buyer as of that particular date. The Commissioner will give due weight and consideration to any and all factors and evidence having a bearing on the market value, such as cost, actual sales and transfers of *similar* properties, * * *.'

"It is not unlikely that the term 'similar properties' contemplates a 'mineral product of like kind and grade'. The District Court concluded that all bituminous coals in the Alabama fields are of like grade if commercially suitable for use in the manufacture of coke generally, regardless of the taxpayer's particular needs. To go further and classify coking coals according to their myriad of actual uses would lead to an unworkable system of grading coal, since the requirements of coke users vary so greatly. There would never be, in the case of coking coal, a 'mineral product of like kind and grade'; we would have a phrase without meaning."

The Alabama By-Products holding was that minerals are of like kind and grade if they are substantially equivalent by commercial standards. Physical, chemical, or geological differences have importance only if they give rise to differences in commercial competition. See Riddell v. California Portland Cement Co., supra; Iowa Limestone Co., 1957, 28 T.C. 881; and Spencer Quarries, Inc., 1956, 27 T.C. 392. Moreover, the

question is not whether the products were actually used for the same commercial purpose but rather whether they *could* have been so used. Here, there is considerable expert testimony supporting the taxpayer's position. Although this Court, on the same facts, might not have reached the same conclusion as the district judge, on the record before us, we cannot say that it was clearly erroneous or that he applied an improper legal standard.

## II.

The case is not over and settled in the taxpayer's favor with our affirmance of the trial court's holding on "like kind and grade."

The following comparative figures are significant:

| Actual gross income from the sale of brick | Hypothetical gross income based on sales price of shredded ball clay |
|---|---|
| 1951 $468,694.11 | $562,172.10 |
| 1952 465,668.33 | 543,436.95 |
| 1953 482,294.78 | 563,842.65 |
| 1954 520,684.56 | 581,570.85 |

The taxpayer argues that there is nothing either unusual or incongruous in holding that "gross income from property" may exceed the amount actually received, and that such a result is compelled by United States v. Cannelton Sewer Pipe Co. Certainly, Cannelton seems to hold that an integrated miner-manufacturer *must* use as his depletable base a hypothetical gross income based on the market price of the mineral sold by the ordinary miner. And, on principle, it is irrelevant whether, in a particular case, the Cannelton rule will give a higher base or a lower base than the gross income from the finished product will yield. Any other method of computing its "gross income from mining", the argument runs, will give a preference to the non-integrated miner of shredded ball clay, and will reintroduce, in reverse, the tax discrimination between integrated and non-integrated miners against which the whole tenor of the Cannelton opinion is directed.

Tax law is law unto itself. There are no equities in tax law. And there is an area of permissible illogic in tax law. But when a taxpayer claims depletion on a fictitious gross income greatly in excess of its actual gross income, we find the claim highly indigestible. If Henderson's explanation for the higher price of Kentucky-Tennessee ball clay is correct, the taxpayer is seeking to deplete the costs of research, advertising, and management it did not incur in selling something it did not sell. We ask, therefore, Did Congress intend this result? And does this result necessarily follow from Cannelton?

The Cannelton decision rests on two bases. First, after a careful scrutiny of the legislative history, the Court concluded that "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles." 364 U.S. at 86, 80 S.Ct. at 1586. The purpose of such an allowance was "not to recompense for costs of recovery but for exhaustion of mineral assets alone." Allowing a miner-manufacturer depletion on his finished product would result in the rate being applied to manufacturing costs, including the plant, machinery and facilities. Thus, in order to apply the depletion rate as nearly as possible to the income from the raw mineral itself, an integrated miner-manufacturer must take as the basis for his hypothetical gross income the market price of the product as sold by the ordinary miner. Second, permitting the use of the sales price of the finished product would give the integrated miner-manufacturer a tax preference and a resulting competitive advantage over the non-integrated miner. Thus, the Court said: "Congress never intended that depletion create such a discriminatory situation. As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion

allowance is concerned." 364 U.S. at 87, 80 S.Ct. at 1587.

Neither of these bases supports the taxpayer's position and the first actively militates against it. If the purpose of Cannelton was to limit depletion as far as possible to the income from the marketable product closest to the raw mineral, there is no basis whatsoever for allowing the taxpayer to use the sum of $10.50 per ton as its base. This would take into account, not only Henderson's permissible costs of mining, but also unallowable costs of manufacturing. Further, it would take into account expenses such as for research and advertising, which non-integrated miners pay, because they are marketing the clay, but which Henderson never incurred. Clearly the proportionate-profits method, although yielding an equally hypothetical result, comes closer to ascertaining the taxpayer's gross income from its purely mining activities than Henderson's market-price method.

Moreover, when the Supreme Court eschewed a method of computing a depletion basis which discriminated against the ordinary miner, it had in mind, primarily, a situation in which the integrated and non-integrated miner were in competition with each other. Depletion computed on the finished product gave the integrated miner-manufacturer a competitive advantage because he found it more economical to integrate his operations, i. e., to mine his own mineral, than to buy the raw material from the non-integrated miner. Here, Henderson and the ceramic ball clay producers of the Kentucky-Tennessee area are in no sense in competition with each other. There is nothing in the record to indicate that if taxpayer had chosen to sell raw ball clay that it would have received $10.50 per ton, the similarities with the Kentucky-Tennessee clay notwithstanding. Perhaps, the most convincing evidence that Henderson was not potentially competitive was that it did not in fact compete. It passes belief that Henderson would buy clay for $10.50 per ton to make into brick selling for $8.75 per ton.

It is true, as Mertens, citing Oliver Iron Mining Co., 10 T.C. 908 and Rev. Rul. 6098 CB 1960–1, p. 252, points out, that " 'gross income from the property' may exceed the amount *actually* received by the owner of the property." (Emphasis added.) 4 Mertens, Law of Federal Income Taxation § 24.32b (1960 Rev.). Thus, for example,

> "where an operating company, having sold control over the operation of mining properties, paid the owner of such properties a proportionate share after deducting all expenses and charges incident to the production and sale of the minerals, it was held that the gross income of the owner, for depletion purposes, was its proportionate part of the gross income of the properties rather than the smaller actual amount which was turned over to it by the operation company." 4 Mertens, Law of Federal Income Taxation § 24.32b (1960 Rev.).

And again,

> "where a mine operator sells his product through a del credere sales agent, the full selling price, unreduced by the sales commission, is the 'gross income from the property' for the purposes of the Code." 4 Mertens, Law of Federal Income Taxation § 24.32b (1962 Cum.Supp.).

There is a real difference between a gross income in excess of the *income actually received* and a hypothetical gross income in excess of the *actual gross income*. In other words, in each of the above illustrations, the taxpayer's gross income was held to include the operating or selling expenses which had been deducted before the income was paid to the taxpayer. This is an entirely different situation from the case at bar. At no point was the taxpayer's actual gross income, unreduced by any expenses incurred in production and selling, $10.50 a ton of any product sold. Cannelton requires the computation of a hypothetical gross income for an integrated miner-manufacturer, but it does not require the computation of *this* kind of gross income. See

Helvering v. Mountain Producers Corp., 1938, 303 U.S. 376, 58 S.Ct. 623, 82 L. Ed. 907; Grandview Mines v. Commissioner, 9 Cir. 1960, 282 F.2d 700; Crews v. Commissioner, 10 Cir. 1937, 89 F.2d 412. In Crews the Court said:

"To allow a deduction on the basis of income never received and therefore no part of the gross income, on the net part of which a tax is exacted would be manifestly unfair. While oil extracted and sold to the Refining Company depleted the land, the depletion allowance is not granted to create a depletion reserve but to allow a deduction from gross income for tax purposes and there should not be included in such gross income proceeds of oil never received by the taxpayer and no part of which became subject to income taxation."

The Government directs us to Roundup Coal Mining Co., 1953, 20 T.C. 388, where no depletion allowance was allowed for coal that was mined and used by the taxpayer to operate its coal mining facilities. The Government argues that this case supports its proposition; there is no actual gross income and hence there can be no constructive gross income. In that case the Tax Court rested its decision primarily on the fact that there was no sale of the coal in question. It is difficult to reconcile Roundup Coal with Woodward Iron Co. v. Patterson, N.D. Ala., 1959, 173 F.Supp. 251. In Woodward Iron the taxpayer, a manufacturer of pig iron, owned certain captive coal mines. The coal from these mines was almost exclusively used to make coke to be used in the manufacture of pig iron. Depletion allowance for the coal used in the manufacturing process was allowed and the comparative market approach was used. There was no more sale of the coal than there was in the Roundup case. Actual gross income from the coal was realized in only the most remote and theoretical way (as part of the sale price of the finished pig iron). The Woodward and Roundup may be distinguished from each other; in Roundup the cost of the coal used in the mining operation is re-

flected in the selling price of the coal produced which is actually sold on the market. The taxpayer will get a depletion allowance based on all of the selling price of this coal whereas the sale of pig iron brings no such deduction.

█ Even if we accept the captive mine case as one where the manufacturer actually receives income which can be constructively attributed to the mining operation, the case before us shows many potential cost considerations that might cause a miner to reduce his gross income in order to enhance its net profits. On the other hand, were the price of the Kentucky-Tennessee ball clay $8.40 per ton (10¢ less than the price of finished brick) the result would be hardly less anomalous, especially in the light of the transportation differentials. Even though the *actual* gross income figure is conclusive when the crude mineral product is sold without further processing or transportation, Helvering v. Mountain Producers Corp., we are forced to conclude that there is no particular magic about it in the context of constructive gross income and thus we can accept no iron-clad rule such as the Government proposes.

█ The competitive market approach is to be used only if there is a "representative market or field price" of an essentially similar product. The Regulation does not allow the indiscriminate use of any price of a product of like kind and grade, but requires the price to be representative; "representative" should be interpreted to qualify the entire phrase "market or field price".

The task of giving specific meaning to the term "representative" in this context is an imposing one. The first source of aid is the allied field of oil and gas. The problem of depletion for the integrated driller-processor or driller-transporter raises the same definitional problems in the determination of gross income. The relevant sentence from Treas.Reg. 118, Section 39.23(m)–1(e) (1) is as follows: "If the oil and gas are not sold on the property but are manufactured or converted into a refined product prior to sale, or are transported from the prop-

erty prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price (as of the date of sale) of the oil and gas before conversion or transportation."

Oil and natural gas are relatively fungible. There is therefore no great difficulty in determining comparative products. Two cases have raised the difficult question of defining "representative market or field price": Hugoton Production Co. v. United States, Ct.Cl., 1963, 315 F.2d 868 and Shamrock Oil & Gas Corp., 1961, 35 T.C. 979. In the Hugoton case the problem in determining representative price was basically one of deciding whether to use the wellhead price, which was included in long term contracts entered into during the tax years in question, or, to use that price which was included in prior long term contracts under which the comparable gas was actually sold during the tax years. The court chose the latter price. In doing so, the court determined the price the taxpayer would have received at the wellhead, if it had sold such gas. If the taxpayer would not have received that price, had the taxpayer chosen to sell at the wellhead, then that price would not be "representative". "Representative market or field price" is not a boiler plate and Hugoton gives us the basic approach with which to attack the question: "In any event, the prime question in defining representative market or field price must be the purpose for which such a price must be calculated." 315 F.2d 868 at 875. "While the act of Congress and regulations adopted in pursuance thereof must be construed according to their plain import, it should be borne in mind in determining the amount of the depletion allowance that such allowance is intended to represent the amount of capital recovered in the product produced by the well, that is the value of the raw product." Brea Cannon Oil Co. v. Commissioner, 9 Cir. 1935, 77 F.2d 67 at 69.

■ In the light of this basic purpose, Regulation 39.23 (m)–1(e) (3) must be seen as a constructive means of estimating that part of the integrated producer's gross income which is attributable to the operation of mining, i. e., the depletion of a capital resource. It is thus a means of *disintegrating* an integrated company back into separate mining and processing entities. The proper gross income is that which the hypothetical mining entity would realize upon selling its products to its processing alter-ego. The need for this constructive disintegration is emphasized by the strong desire to afford no unfair tax advantage to the integrated producer vis-a-vis the non-integrated miners and manufacturers. The representative price is then the competitive going price for the product, i. e., the price charged by the taxpayer's competitors.

Clearly the Kentucky-Tennessee ball clay price of $10.50 per ton is not representative insofar as its use does not fulfill the statutory objective outlined above. This price in no way represents the depletion of the taxpayer's clay resources and in no way represents the price which a non-integrated brick manufacturer would pay for clay with which to make brick.

Turning again to Cannelton, we observe that in Cannelton the question was one of identifying the first commercially marketable product so as to mark the end of the mining process for the purposes of Section 114(b) (4). The court held that commercial profitability was not relevant in defining the product which had passed sufficiently from its natural state so as to become marketable. The case was remanded to be treated according to Regulation 39.23(m)–1(e) (3); there is no indication that the proceedings in the Supreme Court have any bearing on this determination over and above the establishment of the "product" on which the depletion allowance is to be granted. Our conclusion, therefore, that the commercial realities demonstrate that the price of $10.50 a ton is not "representative" is consistent with Cannelton.

There is one final problem with the taxpayer's position. Henderson has suggested that it sells brick for $8.75 per ton in-

stead of clay for $10.50 per ton because the research, advertising and marketing expenses involved in selling clay might well result in a lower net profit than that received from selling brick. If this is true, then it would be necessary for the taxpayer to compute a *hypothetical net income* corresponding to its proposed hypothetical gross income. Section 114(b) (4) (A) allows a depletion allowance only up to fifty per cent of the taxpayer's net income. Since fifteen per cent of $10.50 would obviously give a much higher allowance than fifteen per cent of $8.- 75 this, coupled with the lower net income which would have been received from the clay, might well have resulted in a depletion allowance in excess of the fifty per cent of net income permitted by the statute. Cf., Comment, 28 U.Chi.L.Rev. 121, 128–129 (1960). What method would be used to determine such a hypothetical net income is far from clear. In short, the taxpayer's position would involve a highly complex interweaving of hypothetical incomes. We cannot believe that Congress, in enacting uniform depletion rates which had, as one of their cardinal virtues, simplicity of operation, ever intended the application of these rates to become bogged down in such complexities.

■ We hold, therefore, that this taxpayer must use the proportionate-profits method of computing depletion base, since that method comes closer to carrying out the intent of the depletion sections, as construed by the Supreme Court in United States v. Cannelton Sewer Pipe Co. than taking the "representative market or field price" for clay "of like kind and grade".

### III.

Section 7422 of the 1954 Code provides that "[n]o suit or proceeding shall be maintained * * * until a claim for refund of credit has been duly filed." [4] The regulations require that each claim must set forth in detail the grounds upon which the refund is sought.[5] The Government argues that Henderson's claims for refund were predicated solely on the contention that since its preprocessed shredded clay had no market value, the gross income from the sale of brick was its depletable basis. The second count of its amended complaint, on which it recovered, was added after the decision in Cannelton, and asserted that the depletable basis was the market price of clay in its shredded form. This count, according to the Government, takes a position diametrically opposite from that urged in the refund claims, and the taxpayer is thus precluded from recovering on it.[6]

■ This argument overlooks the purpose of these administrative regulations. Treasury Regulation 301.6402–2 itself states that "the claim must set

---

4. "Section 7422. Civil actions for refund
"(a) No suit prior to filing claim for refund.—
"No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

5. "Section 301.6402–2 Claims for credit or refund.—
"(b) Grounds set forth in claim. No refund or credit will be allowed after the expiration of the statutory period of

limitations applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. * * *"

6. "Section 6511. Limitations on credit or refund.
"(a) Period of limitation on filing claim.—
"Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was required to be filed * * * or 2 years from the time the tax was paid, whichever of such periods expired the later * * *."

forth in detail each ground upon which a credit or refund is claimed and facts *sufficient to apprise the Commissioner* of the exact basis thereof," (emphasis added), and, as we pointed out in Carmack v. Scofield, 5 Cir. 1953, 201 F.2d 360, 361–362, "[t]he principal requirement of the statute * * * and regulations supplementary thereto, is that the Commissioner be apprised by the timely filing of a claim of the exact basis upon which the claim for a refund is predicated."

Henderson's claims for refund, filed shortly after it had paid the deficiency assessments, stated that the depletion allowance permitted by the Revenue Agent was erroneous, that it was entitled to a fifteen per cent depletion rate on its gross income from mining ball clay; and that is first commercially marketable mineral product, which, according to § 114(b) (4) (B), constitutes the depletable basis, was finished burnt brick. These claims were rejected on various dates between April 13, 1956, and November 13, 1957. On January 27, 1958, Henderson filed this suit, alleging that its depletable basis was the gross income from the sale of brick. After a conference, attorneys for both parties agreed that the case should be settled, and a joint motion for a continuance was granted. The motion, filed July 3, 1958, stated in part:

> "That Plaintiff and Defendant have agreed on all issues of fact and the law of the case except as to one point, that point is as to whether or not ball clay has no substantial market value in the area of the Plaintiff's operation for other purposes other than the making of brick. Both Plaintiff and Defendant are making their investigation at this time as to such question, and it is the opinion of the attorneys of both Plaintiff and Defendant that said cause can be settled without the necessity of further litigation if said cause is concluded."

Another joint motion for continuance was granted on August 26, 1958.

On September 12, 1958 plaintiff's attorney wrote the Department of Justice offering to settle on the basis of the original complaint and pointing out the facts later to become the basis of the second count in the amended complaint: that taxpayer processed shredded ball clay which, on the national market, brought an average price of $10.50 per ton and that this price should be used in determining the depletion deduction. September 27, 1958, the Justice Department wrote acknowledging receipt of the letter and advising that it would obtain the views of the Chief Counsel of the Internal Revenue Service. In October the parties' attorneys discussed the facts set forth in the letter of September 12, 1958, and inquiries were made at Henderson's plant about its clay.

Several more continuances were granted at the joint request of both parties, and on December 24, 1959, defendant requested another continuance pending the disposition by the Supreme Court of the Cannelton case. The Government indicated that the decision in that case would be dispositive of the issues involved in Henderson. The Supreme Court handed down its decision on June 27, 1960, and held that an integrated miner-manufacturer's depletable basis was not the gross sales price of the finished product, but the value of the mineral at the point where it was sold by the non-integrated miner. December 14, 1960, Henderson amended its complaint to include the grounds for refund set forth in its letter of September 12, 1958, and supported, in part at least, by Cannelton. The defendant did not object to this amendment and its answer, filed January 16, 1961, did not assert that the original claims for tax refund were not broad enough to include this second count. In fact, in February, 1961, an Internal Revenue agent again visited Henderson's plant and took samples of its clay, and in March the Government took the depositions of several non-integrated clay miners in the Kentucky-Tennessee area.

The District Judge found that the taxpayer set forth the factual basis for the second count of its amended complaint in its letter of September 12, 1958, and the Commissioner had knowledge of

this alternative ground for refund and investigated it for two and a half years before the date of trial. See United States v. Humble Oil & Refining Co., 5 Cir. 1934, 69 F.2d 214, 217. On this record there is ample support for the District Judge's finding that the Commissioner did in fact waive the provisions of Treas.Reg. 301.6402–2 requiring the facts upon which the complaint is based to be set forth in the claim for refund.

 The taxpayer's second count, which is based on the facts set out in its letter of September 12, 1958, asserts no other ground for recovery than its original claims. Both are based upon § 114 (b) (4) (B), and the amended complaint merely takes account of a definitive construction of that subsection which was handed down between the date of the claims and the date of trial.

In Hartley v. United States, 5 Cir., 1958, 252 F.2d 262, the taxpayer's refund claim, based on the theory that his rebuilt engines were not parts under the excise tax statute, stated

> "The tax is limited to the sale price of only the old used parts reworked, or machined, by taxpayer. The tax does not apply to subsequent sales by taxpayer, a purchaser of new automobile parts, purchase tax paid by him, from other manufacturers. The putting together by taxpayer of new automobile parts complete in themselves purchased taxpaid, with old parts machined by him, which are also complete within themselves, and on which he paid the tax, does not result in another and different taxable article."

In holding that the refund claim was broad enough to support a complaint based on the proposition that the taxpayer was not a "manufacturer" within the meaning of the statute as well as one based on the ground that rebuilt engines were not "parts," this Court stated,

> "[W]e are of the clear opinion * * that under the facts of this case, Burrell v. Fahs, 232 F.2d 163 (5th

Cir. 1956), and not Carmack v. Scofield, 201 F.2d 360 (5th Cir. 1953) is controlling here, and that, therefore, the taxpayer's claim for refund comprehended, embraced, and included the issue tendered by taxpayer in his complaint and here, whether International's operations constituted manufacturing within the meaning of the applicable statute." 252 F.2d at 266.

We hold that the trial judge did not err in refusing to dismiss the second count of Henderson's amended complaint.

The judgment is reversed and remanded.