**HENDERSON CLAY PRODUCTS, INC.**

v.

**The UNITED STATES.**

No. 87–75.

United States Court of Claims.

July 16, 1980.

John G. Heard, Houston, Tex., Atty. of record, for plaintiff. Thomas P. Marinis, Jr., Glen A. Rosenbaum and Vinson & Elkins, Houston, Tex., of counsel.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended decision of Senior Trial Judge Mastin G. White, filed October 10, 1979, pursuant to Rule 134(h), having been submitted and considered on the briefs and oral argument of counsel. The court is satisfied with the trial judge's findings of fact with respect to, and articulation of the standard for this case of, the representative market or field price for the taxpayer's ore or mineral—the threshold factual issue in the case which is determinative of the case—and therefore deletes from the trial judge's opinion and findings the discussion of unnecessary issues which might otherwise be involved and which need not be reached in this case. Since the court agrees with the trial judge's decision, as modified and as hereinafter set forth,* it hereby affirms and adopts the decision, as modified, and the following Conclusion of Law as the basis for its judgment in the case.

---

* Although the court has adopted the trial judge's recommended Conclusion of Law, the printed portions of his opinion and certain of his findings of fact, which are not printed herein since such facts as are necessary to the decision are contained in his opinion, the court deletes and does not adopt findings 77–96 inclusive.

OPINION OF TRIAL JUDGE **

WHITE, Senior Trial Judge: The plaintiff, an integrated miner–manufacturer, mines clay from deposits which it owns in the vicinity of Henderson, Texas, and uses the clay to manufacture brick of such high quality that it is sold throughout the United States for use in architecturally demanding construction projects. The plaintiff (which will sometimes be referred to in the opinion as "Henderson") seeks in the present case to recover a total of $830,295.45 (plus interest), representing income tax deficiencies, and interest thereon, which were assessed against and paid by the plaintiff for its 8 fiscal years during the 1956–63 period. The plaintiff's fiscal year begins on April 1 and extends through the following March 31.

The basic issue in the case is whether it was proper for the plaintiff, in claiming percentage depletion deductions for the years in question under sections 611 and 613 of the Internal Revenue Code of 1954, to use the price of Kentucky–Tennessee ball clay as the representative market or field price for the purpose of determining the plaintiff's gross income from its mining operations.

At the time involved in the present litigation, section 611 of the 1954 Code provided in part as follows:

In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * *, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary [of the Treasury] or his delegate. * * *

Subsection (a) of section 613 partially provided that in the case of mines, "the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property * * *"; subsection (b) prescribed percentage depletion rates for a large num-

** The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h).

ber of minerals, including a 15 percent rate for "ball clay" and a 5 percent rate for "bride and tile clay"; and subsection (c) defined the term "gross income from the property" as meaning the gross income from mining.

As an integrated miner–manufacturer (such as the plaintiff) does not market in raw form the mineral that it takes from the mine, there is a problem involved in ascertaining the company's gross income from mining. This matter is dealt with in a Treasury regulation, 26 C.F.R. § 1.613–4, which provides in part as follows:

(c) *Cases where a representative market or field price for the taxpayer's ore or mineral can be ascertained* –(1) *General rule.* If the taxpayer processes the ore or mineral before sale by the application of nonmining processes (including nonmining transportation), or uses it in his operations, gross income from mining shall be computed by use of the representative market or field price of an ore or mineral of like kind and grade as the taxpayer's ore or mineral after the application of the mining processes actually applied (if any) * * *

* * * * * *

(6) *Limitation on gross income from mining computed under the provisions of this paragraph.* It shall be presumed that a price is not a representative market or field price for the taxpayer's ore or mineral if the sum of such price plus the total of all costs of the nonmining processes * * * which the taxpayer applies to his ore or mineral regularly exceeds the taxpayer's actual sales price of his product. * * *

* * * * * *

(d) *Cases where a representative market or field price cannot be ascertained* –(1) *General rule.* (i) If it is impossible to determine a representative market or field price as described in paragraph (c) of this section then * * * gross in-

come from mining shall be computed by use of the proportionate profits method as set forth in subparagraph (4) of this paragraph. * * *

As indicated previously in the opinion, the plaintiff owns clay mines in the vicinity of Henderson, Texas, and is engaged in the business of mining clay from its mines for use by it in the manufacture of brick. Most of the clay is designated by the plaintiff as ball clay, and the remainder is designated as brick and tile clay. All of the clay is used by the plaintiff for the manufacture of brick. Only the clay designated as ball clay is involved in the present litigation.

In preparing its income tax return for each of the fiscal years previously mentioned, the plaintiff claimed a percentage depletion deduction based on its gross income from mining clay. With respect to most of the clay mined, the plaintiff computed its gross income from mining by using what it regarded as a representative market or field price based on the price of ball clay mined in the Kentucky–Tennessee area of the United States, and claimed a 15 percent depletion deduction. It was the plaintiff's view that Kentucky–Tennessee ball clay was a "mineral of like kind and grade" as the plaintiff clay for which the 15 percent depletion allowance was claimed.

The Internal Revenue Service, upon auditing the plaintiff's income tax returns for the years involved in the present litigation, wholly disallowed the use of any representative market or field price in computing the plaintiff's gross income from mining for percentage depletion purposes, reduced the plaintiff's percentage depletion deductions by redetermining the plaintiff's gross income from mining on the basis of proportionate profits calculations, and assessed against the plaintiff deficiencies in the total amount of $830,295.49 (including interest).

The plaintiff paid the deficiencies, and then filed claims for refund, which the Internal Revenue Service did not allow. The present litigation followed.

On January 24, 1977, the defendant filed a motion for partial summary judgment. This motion was denied by the court in an order dated January 6, 1978, the court having concluded that there were material facts in dispute. Much evidence was subsequently received at a trial that was held in July 1978; and the post–trial proceedings under Rule 134(a)–(g) were concluded on August 16, 1979.

This case represents Henderson's third attempt to gain judicial approval of its position that, in claiming percentage depletion deductions for income tax purposes with respect to most of the clay which it mines, it is entitled to use a representative market or field price, based upon the price of Kentucky–Tennessee ball clay, in computing its gross income from mining. The first case, involving the plaintiff's fiscal years during the 1951–54 period, was *United States v. Henderson Clay Products*, 324 F.2d 7 (1963), rev'g 199 F.Supp. 304 (E.D.Tex.1961), cert. denied, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964). The second case, involving the plaintiff's fiscal year 1955, was *Henderson Clay Products v. United States*, 377 F.2d 349 (5th Cir. 1967), aff'g 252 F.Supp. 1013 (E.D.Tex.1966).

In the earlier cases, the Government did not dispute Henderson's contention that most of the clay which it mined and used for the manufacture of brick was ball clay; and the appellate court considered each case on the basis of factual determinations by the trial court that Henderson mined ball clay, that the first commercially marketable product obtained by Henderson from the mining of its ball clay was shredded ball clay (i. e., raw clay which has been run through a shredding machine and reduced to walnut–sized or smaller pieces), that the plaintiff's ball clay mined during the pertinent period and Kentucky–Tennessee ball clay were minerals of like kind and grade, and that shredded ball clay produced by Kentucky–Tennessee clay miners had an average market price or value of $10.50 per ton during the 1951–54 period (which was involved in the first case) and $10.00 per ton in 1955 (the year involved in the second case). However, Henderson's attempt to use $10.50 per ton in the first case, and $10 per ton in the second case, as a representa-

tive market or field price in computing its gross income from mining for depletion allowance purposes was denied by the appellate court.

The appellate court concluded in the first case (324 F.2d at 15) that the "commercial realities" demonstrated that the price of $10.50 per ton was not a representative market or field price for Henderson's shredded clay, because it did not represent the price which a non–integrated brick manufacturer would pay for clay with which to make brick. During the period involved in that case, Henderson sold its finished brick for only $8.75 per ton, and would have sustained a substantial loss if it had paid $10.50 per ton for shredded clay.

In the second case, the appellate court also concluded (377 F.2d at 353–54) that the $10 price received in 1955 by Kentucky–Tennessee miners for shredded ball clay was not, as to Henderson, a representative market or field price. Henderson sold its brick in 1955 for an average price of $12.38 per ton, and could not have operated profitably if it had paid $10 per ton for shredded clay. Also, the evidence in the second case indicated that Henderson did not have the equipment that would have been necessary to prepare its clay for sale in the ball clay market.

In the present case, the plaintiff's petition alleged in part that the plaintiff "is engaged in the business of mining ball clay * * * and making brick therefrom"; and this part of the petition was admitted by the defendant in its answer. Also, the plaintiff's statement in its initial pretrial submission concerning the material facts believed to be uncontroverted included a statement that "Plaintiff owns ball clay mines in Texas and is engaged in the business of mining ball clay from its mines for use in the manufacture of brick"; and the defendant's response stated that the defendant agreed with this factual statement. Throughout the litigation, however, the defendant has consistently taken the position that none of the plaintiff's clay was a "mineral of like kind and grade" as Kentucky–Tennessee ball clay, and, accordingly, that the price per ton received by Kentucky–Tennessee ball clay miners for clay during the period in question was not, as to the plaintiff, a representative market or field price for depletion allowance purposes.

At the trial, therefore, the plaintiff's initial burden, as a taxpayer claiming entitlement to an income tax deduction, was to present evidence showing clearly that Kentucky–Tennessee ball clay was, in fact, a "mineral of like kind and grade" as the plaintiff's clay involved in the litigation. Cf. Monfore v. United States, 214 Ct.Cl. 705, 721 (1977); International Trading Co. v. Commissioner, 275 F.2d 578, 584 (7th Cir. 1960); Green v. United States, 460 F.2d 412, 419 (5th Cir. 1972).

The term "ball clay" is not a precise term having a precise definition. Instead, it is a "use term" that describes a clay which is, or can be, used commercially as a clay component in the manufacture of sanitary ware, electrical porcelain, artware, dinnerware, hotel china, or other high–temperature ceramic products. Most of the commercial ball clay in the United States is mined in Kentucky and Tennessee.

All of the clay mined by Henderson during the years in issue was used by Henderson for the manufacture of brick. None of it was used for the production of high–temperature ceramic items. This, however, does not necessarily prevent the plaintiff from recovering with respect to the clay which it designates as ball clay. The proper test is not whether such clay was actually used for the same commercial purposes as Kentucky–Tennessee ball clay, but whether it could have been used for such purposes. Alabama By–Products Corp. v. Patterson, 258 F.2d 892, 898–99 (5th Cir. 1958), cert. denied, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed. 303 (1959).

The plaintiff owns what is sometimes referred to as the main pit, and also owns two other pits, which are located approximately 4 miles from the main pit and are known as the Montgomery pit and the Hunt pit. The main pit contains various clay strata, and the plaintiff designates clay from five of these strata–referred to as white, plastic,

pyrite, red sandy, and white sandy–as ball clay. Clay mined from the Montgomery pit is commonly referred to as montgomery clay; and clay mined from the Hunt pit is commonly referred to as hunt clay. The plaintiff designates montgomery clay and hunt clay as ball clay.

During the first 5 years (1956–60) of the 8–year period involved in the present case, only the main pit was in operation. Although there is evidence in the record showing the total quantity of clay mined from the main pit during each of the 5 years, there is no way of determining from the evidence what portions of the total annual quantity were mined from the white, plastic, pyrite red sandy, and white sandy strata, respectively.

With respect to the 1961–63 period, however, the evidence in the record does show for each year how much white, plastic, pyrite, red sandy, white sandy, hunt (in 1961 and 1962 only), and montgomery (in 1962 and 1963 only) clays were mined by the plaintiff. Even in connection with the 1961–63 period, however, there is a deficiency in the record.

There are various geologic, mineral, and ceramic analyses and types of testing that may be used to include or exclude a clay as a potential candidate for use in high–temperature ceramic products. The record lacks information along this line with respect to white, white sandy, and hunt clay mined by the plaintiff (although there is some evidence concerning the nature of a mixture of plastic and either white or white sandy). Obviously, it cannot be determined on the basis of the evidence in the record whether Kentucky–Tennessee ball clay was or was not a "mineral of like kind and grade" as Henderson's white, white sandy, and hunt clay, in view of the lack of information concerning the nature of these clays. Also, as previously indicated, it is not known how much of the clay mined by the plaintiff during the 1956–60 period consisted of white and white sandy clays.

There is evidence in the record concerning Henderson's plastic, pyrite, red sandy, and montgomery clays; and these clays will be discussed in the opinion.

From the mineralogical standpoint, Kentucky–Tennessee ball clay is composed of kaolinite, quartz, montmorillonite, and illite. Evidence in the record indicates that Kentucky–Tennessee ball clay contains kaolinite to the extent of approximately 70–75 percent, quartz to the extent of approximately 20 percent, montmorillonite up to 5 percent, and illite up to 5 percent. It appears from the evidence in the record concerning the mineral content of the identified Henderson clays that: (1) plastic includes kaolinite to the extent of approximately 70 percent, quartz to the extent of approximately 25 percent, and montmorillonite and illite to the total extent of approximately 5 percent; (2) pyrite contains kaolinite to the extent of approximately 70 percent, quartz to the extent of approximately 20 percent, montmorillonite to the extent of approximately 10 percent, and a trace of illite; (3) red sandy contains kaolinite to the extent of approximately 55 percent, quartz to the extent of approximately 35 percent, montmorillonite to the extent of approximately 5 percent, and illite to the extent of approximately 5 percent; and (4) montgomery contains kaolinite to the extent of approximately 50 percent, quartz to the extent of approximately 45 percent, a trace of montmorillonite, and a trace of illite.

Thus, it will be noted that, in comparison with the mineral content of Kentucky–Tennessee ball clay, the Henderson pyrite has an excessive amount of montmorillonite, and the red sandy and montgomery are each high in quartz and correspondingly low in kaolinite. These variations raise a substantial question regarding the commercial suitability of red sandy, pyrite, and montgomery clays for use in high–temperature ceramic products. On the other hand, the plastic clay is quite similar to Kentucky–Tennessee ball clay in mineral content. As previously stated, it is not known how much of the clay mined by the plaintiff during the 1956–60 period consisted of plastic, pyrite, or red sandy clay (no montgomery clay was produced during that period). The record lacks information regarding the mineral

content of Henderson clays identified as white, white sandy, and hunt.

In addition to an appropriate mineral content, a clay must possess certain physical characteristics before it can be considered as a candidate for potential use as a clay component in high–temperature ceramic products. In this connection, data sheets utilized by Kentucky–Tennessee ball clay miners generally include information on such characteristics as fired color, water of plasticity, linear drying shrinkage, dry modulus of rupture, firing shrinkage, fired modulus of rupture, and fired absorption.

There is a considerable amount of evidence in the record, based on laboratory tests, with respect to the fired colors of samples of Henderson clay identified as plastic, pyrite, red sandy, and a mixture of plastic and either white or white sandy. In general, the evidence on this point shows that the fired colors of the samples, when fired at temperatures ranging between cone 04 and cone 11, were within the fired–color range of Kentucky–Tennessee ball clay (although in one test a sample of red sandy clay fired off–color). The high–temperature ceramics in which ball clay is used are customarily fired at temperatures ranging between cone 11 and cone 13. When one sample of Henderson pyrite clay was fired to cone 12, the fired color was within the fired–color range of Kentucky–Tennessee ball clay, but the pyrite clay overfired. The record lacks information regarding the fired colors of Henderson clays identified as montgomery, hunt, white, and white sandy.

Data in the record indicate that when samples of identified Henderson clay–i. e., plastic, pyrite, red sandy, and a mixture of plastic and either white or white sandy– were subjected to laboratory tests for the factors of water of plasticity, linear drying shrinkage, dry modulus of rupture, firing shrinkage, fired modulus of rupture, and fired absorption, the results were generally favorable, in relation to the results of such tests on Kentucky–Tennessee ball clay. The record lacks information along these lines with respect to Henderson clays identified as montgomery, hunt, white, and white sandy.

In themselves, the results of the tests referred to in the preceding paragraph, and the results of the tests as to mineral content and fired colors, cannot be relied on as definitely establishing–or rejecting–any Henderson clay as a "mineral of like kind and grade" as Kentucky–Tennessee ball clay.

In addition to the problems previously mentioned as arising from the lack of information regarding the extent to which the various clays regarded by Henderson as ball clays were mined during the 1956–60 period, and the lack of information regarding the mineral content and physical characteristics of some of these clays, a crucial difficulty from the plaintiff's standpoint is that–according to the consensus of the experts on both sides who testified at the trial–a definite determination that a particular clay is suitable for commercial use as a clay component in a high–temperature ceramic product can only be made on the basis of a pilot–plant run. This is so even though the results of all laboratory tests to determine the mineral content and physical characteristics of a clay are favorable.

So far as the evidence in the record shows, none of the Henderson clays has ever been the subject of a pilot–plant run in which it was used as a clay component in a high–temperature ceramic item.

Perhaps it should be mentioned at this point that Gilmer Potteries, Inc., which is located in Gilmer, Texas, and which manufactures vitreous china, bathroom accessories, and some food–service items, conducted an experiment that involved the use of samples of Henderson pyrite clay, red sandy clay, and a mixture of plastic clay and either white or white sandy clay. The standard Gilmer production body consists of ball clay to the extent of 30 percent; and the Henderson clays were used in experimental bodies instead of the ball clay customarily used. The experimental bodies had higher fired strengths than the standard production body which utilized commercial ball clay, they compared favorably in their drain–casting characteristics with the stan-

dard production body they fired to colors that compared favorably with the standard production body, and the plasticity of the Henderson clays was found to be acceptable. However, the general manager of Gilmer Potteries testified at the trial that further testing of the Henderson clays, and a pilot–plant run using such clays, would be necessary before any of the Henderson clays could be adopted as the regular clay component of Gilmer Potteries' standard production body.

In addition, a sample of Henderson clay that consisted of a mixture of plastic clay and either white or white sandy clay was used experimentally by Kilgore Ceramics Corporation, which manufactures plumbing fixtures in Kilgore, Texas. At the time of the experiment, 31 percent of the company's standard production body consisted of a combination of three Kentucky–Tennessee ball clays, including KC 3 to the extent of 15 percent. In the experiment, the Henderson clay was substituted for one–half of the KC 3 ball clay, so that the test body consisted of Henderson clay to the extent of 7.5 percent. The test results indicated that the Henderson clay involved in the experiment could probably be substituted satisfactorily for one–half of the KC 3 ball clay component in the standard production body. However, a representative of Kilgore Ceramics Corporation testified at the trial that a pilot–plant operation involving the use of Henderson clay would be necessary before a final decision could be made on the acceptability of Henderson clay as a substitute for part of the usual ball clay component in the standard production body.

By. way of summary, therefore, it must be concluded that the plaintiff has failed to sustain its initial burden of showing clearly that Kentucky–Tennessee ball clay was, in fact, a "mineral of like kind and grade" as the plaintiff's clay involved in the litigation. Consequently, the price of Kentucky–Tennessee ball clay could not be used by the plaintiff as the representative market or field price for its clay in determining the plaintiff's gross income from mining for depletion allowance purposes.

## CONCLUSION OF LAW

Upon the findings of fact and the trial judge's opinion as set forth, which are adopted by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is therefore dismissed.