CLEVENGER, Circuit Judge.
 

 Invoking our jurisdiction under 28 U.S.C. § 1295(a)(3) (1994), Exxon Corporation and its subsidiaries (Exxon) appeals from the decision by the Court of Federal Claims in
 
 Exxon Corp. v. United States,
 
 33 Fed.Cl. 250 (1995). In that decision, the court held that Exxon’s claimed depletion deduction was based on a legally insufficient representative price and, in any event, was unreasonable. As a result, the court rejected Exxon’s claimed deduction and affirmed the proportionate profits method employed by the Commissioner of the Internal Revenue Service (IRS) to calculate Exxon’s allowable depletion deduction. We reverse and remand.
 

 I
 

 Exxon is a fully integrated producer of natural gas. As such, Exxon engages in all phases of the business, including exploration, extraction, processing, and transportation. In contrast, a nonintegrated producer sells natural gas immediately after extracting it, leaving to others the processing and distribution functions.
 

 In order to support the major capital commitment required to develop its pipeline system, Exxon entered into several long-term natural gas sales contracts from 1953 to 1972, known as the Texas Industrial Commitments (TIC) contracts. Such contracts were common during this period because natural gas prices were stable and low. At the time these contráete were signed, the price terms were favorable to Exxon.
 

 During the early 1970s, however, increased demand coupled with fears of an energy shortage led to a rapid escalation in the price of natural gas. The market price of natural gas doubled in 1973, and doubled again in 1974. In this seller’s market, producers who were not already committed under long term contracts could practically write their own deals. In contrast, two thirds of Exxon’s gas production was committed under the TIC contracts at an average delivery price of $0.23 per thousand cubic feet (Mcf).
 
 [1]
 

 Although Exxon’s sales were limited by these long-term contracts, Exxon believed its depletion deduction for tax purposes was not. For nonintegrated producers of natural gas, the depletion deduction is based on actual gross income, a known figure. Because the actual gross income of integrated producers includes revenue from transportation and processing, however, their depletion deduction is based on a constructive gross income derived from the average wellhead market price for similar gas. As explained in more detail below, the governing regulations refer to this average price as the representative market or field price (RMFP).
 

 For its 1974 tax return, Exxon determined that the “field price” of similar natural gas was $0.36/Mcf. Because much of Exxon’s gas production was committed under the TIC contracts at $0.23/Mcf, this “field price” exceeded Exxon’s average actual sale price. Based upon a constructive gross income de
 
 *838
 
 rived from this figure,
 
 [2]
 
 Exxon claimed depletion deductions totaling $170,094,205 with respect to the properties in issue.
 

 On audit, the IRS determined that Exxon may not claim a depletion deduction based on an RMFP in excess of its actual gross income. Instead of using an RMFP, the IRS derived Exxon’s depletion deduction based on Exxon’s actual gross receipts from the TIC contracts. This methodology yielded a depletion deduction $11,105,698 lower than Exxon had claimed, thereby increasing Exxon’s tax obligation for 1974 by $5,330,734. Exxon paid the tax and filed a refund suit in the Court of Federal Claims.
 

 The Court of Federal Claims rejected the IRS’ position that the RMFP, as a matter of law, can never exceed the taxpayer’s actual gross income for purposes of calculating the depletion deduction. The court noted that nothing in the statute or regulations imposes such a limit. Because some of Exxon’s data samples were improper, however, the court held that the RMFP proposed by Exxon was legally insufficient.
 

 Moreover, the court decided that even if Exxon’s figure was valid, the court had an independent duty to evaluate the reasonableness of an RMFP on a case-by-case basis. In the present case, the court decided it would be unreasonable to allow Exxon to use an RMFP in excess of its actual gross income. Accordingly, the court entered judgment in favor of the IRS.
 

 II
 

 On appeal, Exxon agrees that the Court of Federal Claims was correct in deciding that the pertinent statutes and regulations do not preclude, as a matter of law, an RMFP that exceeds the price actually charged for the gas sold. Exxon instead contends that the Court of Federal Claims erred in holding that Exxon had failed to prove a valid RMFP on the facts of this case. In addition, Exxon argues that the court erred in making an independent assessment of the reasonableness of Exxon’s RMFP.
 

 While the government defends the ultimate decision of the Court of Federal Claims, it argues that the court erred in holding that an RMFP may be used even if it exceeds the taxpayer’s actual gross income. Alternatively, the government argues that the court correctly held that Exxon had failed to prove a valid RMFP. The government also supports the court’s determination that it has authority to conduct an independent assessment of the reasonableness of a particular RMFP, and that Exxon’s RMFP is unreasonable when so assessed.
 

 The opinion of the Court of Federal Claims explains at length and with admirable clarity the history of the depletion deduction in American tax law. We therefore need not repeat that background information and may proceed to the core issue of this appeal. The outcome of this ease turns particularly on three statutes and one regulation. The Internal Revenue Code (IRC) provides that: In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate.
 

 I.R.C. § 611(a) (1974).
 
 [3]
 

 Under section 613 of the IRC, the depletion allowance is limited to “50 percent of the taxpayer’s taxable income from the property (computed without allowance for depletion).” I.R.C. § 613(a). Moreover, the depletion allowance for oil or gas property is 22 percent of the “gross income from the property.” I.R.C. § 613(a), (b).
 

 There is no statutory definition of the term “gross income from the property.” Instead, pursuant to the authority delegated to the
 
 *839
 
 Secretary I.R.C. § 611, he has defined its meaning as follows:
 

 In the case of oil and gas wells, “gross income from the property”, as used in section 613(c)(1), means the amount for which the taxpayer sells the oil or gas in the immediate vicinity of the well. If the oil or gas is not sold on the premises but is manufactured or converted into a refined product prior to sale, or is transported from the premises prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or filed [sic, field] price [RMFP] of the oil or gas before conversion or transportation.
 

 Treas. Reg. § 1.613-3(a) (1974).
 
 [4]
 

 As the Court of Federal Claims recognized, the dispute in the present case focuses upon the application of this regulation in the context of depletion allowances for oil and gas.
 

 Ill
 

 As an initial matter, we address the government’s contention that the statutes and regulations preclude, as a matter of law, the use of an RMFP that exceeds the taxpayer’s actual gross income. The government first contends that the extant case law has already answered this question in its favor. Even if that is not so, the government argues that a proper interpretation of the statutory and regulatory provisions precludes such a result. We disagree on both bases.
 

 A
 

 We turn first to the government’s argument founded upon case law. In support of this argument, the government cites
 
 United States v. Henderson Clay Prods.,
 
 324 F.2d 7 (5th Cir.1963), and
 
 Panhandle Eastern Pipe Line Co. v. United States,
 
 187 Ct.Cl. 129, 408 F.2d 690 (1969). These cases are best understood in the context of two other eases,
 
 Hu-goton Prod. Co. v. United States,
 
 161 Ct.Cl. 274, 315 F.2d 868 (1963)
 
 (Hugoton I),
 
 and
 
 Hugoton Prod. Co. v. United States,
 
 172 Ct.Cl. 444, 349 F.2d 418 (1965)
 
 (.Hugoton II).
 
 We do not find the precedent to be quite as dispositive as does the government, and conclude that no case has squarely addressed this issue.
 

 In
 
 Hugoton I,
 
 the plaintiff was an integrated producer of natural gas who claimed that gross income for depletion purposes should be computed based on an RMFP.
 
 [5]
 

 Hugoton I,
 
 315 F.2d at 870. The government, on the other hand, contended that there was no representative price for the plaintiff during the tax years at issue and therefore a proportionate profits method should be used.
 
 [6]
 

 The court decided that the RMFP approach must be used whenever a representative price can be established.
 
 Id.
 
 315 F.2d at 873. The court explained that although the Commissioner of the IRS could validly embody the proportionate profits method in regulations, he had chosen the RMFP approach and had defended its application when it produced larger revenues for the government.
 
 Id.
 
 at 872-73. Because the Commissioner did not include all contracts in his initial determination that there was no representative price, however, the court remanded for further findings.
 
 Id.
 
 at 877.
 

 In the present case, Exxon’s feet were held to the fire during the pre-1974 years when the RMFP was below Exxon’s actual sales; at that time, Exxon accepted the RMFP approach although the proportionate profits approach would have been more favorable. During those years, the RMFP approach
 
 *840
 
 worked to the benefit of the government. Now, when the RMFP approach would work to the benefit of the taxpayer, the Commissioner asserts that he is permitted to use the proportionate profits approach.
 

 The government insists that such a result is permissible based on prior case law. Between the times that
 
 Hugoton I
 
 and
 
 Hugoton II
 
 were decided, the Fifth Circuit was faced with a similar ease in the context of depletion deductions for clay mining. In
 
 Henderson Clay,
 
 the plaintiff was an integrated manufacturer that extracted ball clay and processed it into finished brick products, which it sold for $8.75 per ton.
 
 Henderson Clay,
 
 324 F.2d at 9. Henderson, however, claimed a depletion deduction based on a representative price of $10.50 per ton, which was the price for shredded ball clay sold in the ceramics market. The Fifth Circuit stated:
 

 Tax law is law unto itself. There are no equities in tax law. And there is an area of permissible illogic in tax law. But when a taxpayer claims depletion on a fictitious gross income greatly in excess of its actual gross income, we find the claim highly indigestible.
 

 Id,
 
 at 12.
 

 The government relies heavily on this section for the proposition that
 
 any
 
 RMFP in excess of actual gross income is highly indigestible and therefore per se impermissible. We do not read
 
 Henderson Clay
 
 in such a sweeping manner.
 

 The Fifth Circuit explicitly recognized that “on principle, it is irrelevant whether, in a particular ease, the Cannelton rule [i.e. using an RMFP] will give a higher base or a lower base than the gross income from the finished product will yield.”
 
 Id.
 
 at 12. On the facts of that particular case, however, the Fifth Circuit concluded that the $10.50 per ton price was not representative.
 
 Id.
 
 at 15.
 

 Most importantly, the court noted that although Henderson claimed an RMFP based on the price for ball clay in the ceramics market, Henderson did not compete with nonintegrated clay producers in that market. The higher price of ball clay sold in the ceramics market was due to advertising, management, and research costs incurred.
 
 See Id.
 
 at 10. As a young company, Henderson chose not to compete in this market because it could not afford the associated costs.
 
 Id.
 
 As a result, the court concluded that the $10.50 per ton price “in no way represents the depletion of the taxpayer’s clay resources and in no way represents the price which a non-integrated brick manufacturer would pay for clay with which to make brick.”
 
 Id.
 
 at 15.
 

 In sum, the Fifth Circuit in
 
 Henderson Clay
 
 did not impose a cap on the RMFP. Instead, it decided that the proposed price was not representative of the price Henderson could have obtained for its ball clay.
 

 We are not the first court to interpret
 
 Henderson Clay
 
 in this manner. As explained above,
 
 Henderson Clay
 
 was decided between
 
 Hugoton I
 
 and
 
 Hugoton II.
 
 On remand after
 
 Hugoton I,
 
 the plaintiff was unhappy with the resulting RMFP and again appealed to the Court of Claims. This time, the plaintiff contended that the RMFP should be rejected because it was not representative and that a proportionate profits method should be applied as was the case in
 
 Henderson Clay. Hugoton II,
 
 349 F.2d at 424-25.
 

 In support of its argument, the plaintiff hypothesized two integrated gas producers, A and B. A obtains $0.15/Mcf for its gas, B obtains $0.05/Mcf, and the RMFP is approximately $0.10/Mcf.
 
 Id.
 
 at 424. The plaintiff explained that “in the case of producer B the hypothetical gross income in each of the taxable years even though based on actual sales of other producers at the wellhead would exceed B’s actual gross income from gathering and processing natural gas.”
 
 Id.
 

 The court “reject[ed] plaintiffs somewhat simplified reasoning that the Fifth Circuit decision resulted in a sweeping rejection of the market comparison method simply because, on the facts presented, it produced results not economically representative of the taxpayer’s integrated business.”
 
 Id.
 
 at 425. Instead, the court noted that the $10.50 per ton price in
 
 Henderson Clay
 
 was rejected as nonrepresentative merely because there was no competition between Henderson and the other clay miners.
 
 Id.
 
 at 426.
 
 Hugoton II,
 
 
 *841
 
 it should be noted, is binding precedent on the decision of this case, and we thus are not at liberty to reject the interpretation given to
 
 Henderson
 
 in
 
 Hugoton II. See South Corp. v. United States,
 
 690 F.2d 1368, 1370 (Fed.Cir. 1982) (in banc).
 

 Finally, the government cites
 
 Panhandle
 
 in support of its argument. In
 
 Panhandle,
 
 the taxpayer entered into a contract with Consumers Power Company to sell gas from fourteen wells at a price of $0.325/Mcf.
 
 Panhandle,
 
 408 F.2d at 710. The delivery point for part of the production from one well, the McPherson No. 1 — 35 well, was near the wellhead. The balance of the production was transported from the wellhead for delivery to Consumers Power Company at locations from thirty to forty miles away.
 
 Id.
 
 at 710-711.
 

 The court determined that the sale price of $0.325/Mcf at McPherson No. 1 — 35 was a valid market price for wellhead sales. Nevertheless, the court determined that under the facts of the case, such a price was not representative of the price that Panhandle could realize for sales at the wellhead.
 
 See id.
 
 at 716. The contract provided that Panhandle would receive $0.325/Mcf whether it sold it at the wellhead or after transportation. Given the undisputed fact that the cost of transportation was $0.035/Mcf, the court inferred that the $0.325/Mcf figure represented a blended price to cover all gas sold under the contract.
 
 Id.
 
 at 716-17. Had the gas been priced separately depending on its delivery point, it presumably would have sold for a higher price after transportation and for a lower price at the wellhead.
 
 See id.
 
 Therefore, the court concluded that $0.325/ Mcf did not represent the wellhead price.
 

 In sum, the cases cited by the government involve situations where the courts decided that the proffered market price was not representative because it included transportation or processing (e.g.advertising) costs. In contrast, the RMFP in the present case exceeds actual gross receipts because of the effects of changing market conditions. Our review of the pertinent case law reveals that no court has explicitly stated that such an RMFP is impermissible.
 

 B
 

 The government next argues that even if the extant case law is not dispositive, the statutes and regulation preclude an RMFP that exceeds the taxpayer’s actual gross income. We begin our analysis with the language of the relevant statutory and regulatory sections, as they read in 1974.
 
 See Johns-Manville Corp. v. United States,
 
 855 F.2d 1556, 1559 (Fed.Cir.1988),
 
 cert. denied,
 
 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989).
 

 Exxon contends that a literal reading of Treas. Reg. § 1.613-3(a) requires the use of an RMFP whenever, as is the case here, the natural gas has been processed and transported away from the premises prior to sale. Moreover, Exxon argues, because the RMFP is a constructed value, actual gross income is irrelevant. We agree that the plain language of the tax scheme supports Exxon’s contention.
 

 Section 611 obligates the Secretary to promulgate regulations that provide for a reasonable allowance. Pursuant to this delegation, the Secretary promulgated only one method of calculating the depletion allowance for integrated natural gas producers — the RMFP. Treas. Reg. § 1.613-3(a). Notably, this regulation contains no language that expressly limits the RMFP to actual gross income.
 

 This lack of an express limit on the RMFP takes on added importance because it is clear that the Secretary was aware of the possibility that the field price could exceed actual revenues. In the area of hard minerals, the Secretary promulgated a regulation creating a rebuttable presumption that such a field price is not representative.
 
 See
 
 Treas. Reg. § 1.613-4(e)(6). Such a limitation is strikingly absent, however, from the oil and gas regulation.
 

 We note that pursuant to the broad authority delegated to him, the Secretary can amend Treas. Reg. § 1.613-3(a) if he so desires to limit the RMFP to actual gross income.
 
 See Hugoton II,
 
 349 F.2d at 430. In fact, the Secretary at one time considered making such an amendment, but that proposal was ultimately withdrawn.
 
 See
 
 36 Fed.
 
 *842
 
 Reg. 19256 (1971); 33 Fed.Reg. 10700 (1968). Until the Secretary imposes such a cap in the oil and gas area, we believe it is not within our judicial powers to legislate in his stead.
 
 See Hugoton II,
 
 349 F.2d at 430.
 

 We nonetheless are mindful that a regulatory provision must not be read in a vacuum, but instead in light of the entire law and its object and policy.
 
 See John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank,
 
 510 U.S. 86, 93-95, 114 S.Ct. 517, 523, 126 L.Ed.2d 524 (1993);
 
 Trustees of Indiana Univ. v. United States,
 
 223 Ct.Cl. 88, 618 F.2d 736, 739 (1980). We therefore must ensure that our interpretation is consistent with the statutory objective.
 

 The Revenue Act of 1918 allowed oil and gas producers a “discovery depletion” deduction based upon the fair market value of the property on the date of discovery of the well. Revenue Act of 1918, Pub.L. No. 65-254, ch. 18, § 234(a)(9), 40 Stat. 1057, 1078-79 (1919). When enacting this statute, Congress feared that taxpayers would use the depletion deduction to offset profits derived from separate and distinct lines of business. S.Rep. No. 275, 67th Cong., 1st Sess. 14-15 (1921). To prevent such abuse, Congress provided that the depletion deduction shall not exceed the net income from the property, computed without allowance for depletion. Revenue Act of 1921, ch. 136, § 234(a)(9), 42 Stat. 227, 256 (1921). In 1924, this restriction was further tightened to cap the depletion deduction at fifty percent of the taxpayer’s net income from the property. Revenue Act of 1924, ch. 234, § 204(c), 43 Stat. 253, 260 (1924). .
 

 Calculating the fair market value on the date of discovery of the well, however, proved to be difficult to administer and created uncertainty. In response, Congress simplified administration of the deduction by basing it upon a percentage of the taxpayer’s gross income from the property. Revenue Act of 1926, ch. 27, § 204(c)(2), 44 Stat. 9, 16 (1926). Because Congress did not define the meaning of gross income from the property, several integrated producers claimed a deduction based upon gross receipts after processing and distribution. In order to ensure that integrated producers did not achieve a greater tax deduction than their nonintegrat-ed competitors,
 
 see Hugoton II,
 
 349 F.2d at 425, Treasury Regulation 74, Art. 221(i) was promulgated stating:
 

 If the oil and gas are not sold on the property but are manufactured or converted into a refined product or are transported from the property prior to sale, then the gross income shall be assumed to be equivalent to the market or field price of the oil and gas before conversion or transportation.
 

 Treas. Reg. 74, Art. 221(i) (1931 ed.). This regulation is substantially similar to Treas. Reg. § 1.613-3(a) at issue in this case.
 

 The legislative history of these provisions therefore reveals two primary limitations. First, the deduction should not allow a taxpayer to offset profits earned from a separate line of business. As explained above, this does not limit the RMFP to actual gross income. Second, integrated manufacturers should not be allowed to include in their “gross income from the property” any value that was added to the gas after extraction, such as by processing or transportation.
 
 See Hugoton I,
 
 315 F.2d at 869. Several courts have referred to this second objective as requiring that an integrated producer not receive a competitive tax advantage over nonintegrated producers.
 

 The government seizes upon this second objective and argues it would be frustrated if Exxon is allowed to use an RMFP in excess of its actual gross receipts. The government notes that some nonintegrated producers entered into long term contracts at low prices just as did Exxon; because they are noninte-grated, however, their depletion deduction would be limited to their low contractual prices rather than a higher deduction based on an RMFP. In other words, the government argues that the statutory objective requires that integrated producers in long term contracts receive no tax advantage over non-integrated producers in long term contracts. We disagree.
 

 Treas. Reg. § 1.613-3(a) and its predecessors were designed to ensure that integrated producers did not include in their gross income calculation any value added by their
 
 *843
 
 processing and transportation components.
 
 See Panhandle,
 
 408 F.2d at 700. The RMFP in the present case exceeds the actual gross income based on market forces and not based on downstream processing. While the legislative history addresses the effects of downstream processing, it is silent as to changes in market conditions. Contrary to the government’s argument, therefore, we do not violate this statutory objective by refusing to limit the RMFP to actual gross income.
 

 In sum, the legislative history does not reveal an intent to limit the RMFP to actual gross receipts. Instead, the legislative history reveals that the RMFP is employed as an inexact, simplified means of calculating an integrated producer’s depletion deduction.
 
 [7]
 
 We therefore agree with the Court of Federal Claims that neither prior case law, nor the language of the statute, nor its legislative history limits an otherwise valid RMFP to actual gross income.
 

 IV
 

 After deciding that the RMFP is not limited to actual gross income, the Court of Federal Claims nonetheless ruled against Exxon. The court decided that, based on the facts of this case, Exxon had failed to prove a valid RMFP.
 

 At trial, Exxon’s pricing expert stated that in 1974, the RMFP for natural gas was $0.41/ Mcf. In support of this proffered RMFP, Exxon submitted data concerning 2,228 sales. These sales allegedly represented over ninety percent of the wellhead sales of comparable unprocessed gas in Exxon’s market area. The court determined that many of these sales should not have been included in the RMFP because they included either dehydration or transportation costs. As to the remaining sales, the court professed that:
 

 The court is unable to extract from the 2,228 sales proffered by Exxon those sales clearly established to be gas sales in the immediate vicinity of the wells. The vastness of Exxon’s sample hindered rather than helped the court determine the accuracy of the proposed RMFP.
 

 Exxon first contends that all of the sales included in its $0.41/Mcf RMFP were proper. Exxon next contends that even if some sales should have been excluded, the court erred by failing to determine an RMFP based on the remaining sales. We disagree with Exxon’s first argument, but agree with the second.
 

 A
 

 As the Court of Federal Claims recognized, calculation of the RMFP is a difficult and sometimes onerous task. This difficulty is exacerbated by the fact that the Secretary has declined to promulgate regulations which could provide guidance to taxpayers and the courts. In the absence of such guidance, both the taxpayers and the courts must formulate and evaluate the RMFP based on a common law approach that looks to prior adjudications of depletion allowances. Although such an approach does not create a unitary test for formulating an RMFP, several general principles may be discerned.
 

 In reviewing prior case law for guidance, we must remember that the fundamental goal of the calculation is to arrive at a price that is
 
 representative
 
 of the price which would be realized by nonintegrated producers. Accordingly, prior cases have stated that the RMFP of gas is calculated as the weighted average price of wellhead sales of comparable gas in the taxpayer’s market area.
 
 Panhandle,
 
 408 F.2d at 703;
 
 Hugoton I,
 
 315 F.2d at 877. In making this calculation, prior cases have emphasized the value in using a large sample size of transactions because the large sample size “should provide greater assurance that the price derived is in fact representative.”
 
 Hugoton I,
 
 315 F.2d at 877. The sample set, however, must be limited to wellhead sales and may not include sales in which the gas was processed or transported by the taxpayer.
 
 Panhandle,
 
 408 F.2d at 716. Finally, the RMFP should
 
 *844
 
 be calculated based on all wellhead sales for the given tax year at issue, regardless of their contract date.
 
 Hugoton I,
 
 315 F.2d at 871.
 

 B
 

 In reliance on this precedent, Exxon compiled data of 2,228 comparable sales. Based on language in
 
 Panhandle,
 
 Exxon derived most of this data from annual reports filed by natural gas pipelines with the Federal Power Commission (FPC) and the Gas Utilities Division (GUD) of the Texas Railroad Commission.
 
 See Panhandle,
 
 408 F.2d at 704-05 (“[i]t would be better, in any future litigation of this same kind, if the parties relied solely upon information contained in said [FPC] forms”). Exxon also confirmed 1,164 of these transactions by reviewing the actual contracts of a single pipeline company. As a result, Exxon arrived at an RMFP of $0.41/ Mcf.
 

 1
 

 As an initial matter, the government argues that
 
 Panhandle
 
 is limited to situations where the two parties agree on which transactions should be included in the RMFP calculation. Where the parties disagree, the government argues,
 
 Panhandle
 
 does not apply and the taxpayer must support its RMFP calculation with actual contracts. We disagree with this reading of
 
 Panhandle.
 

 Panhandle
 
 does not resolve any dispute as to which transactions should be included in the RMFP calculation. Instead,
 
 Panhandle
 
 merely articulates the form of proof that will suffice to represent those transactions. When read in context,
 
 Panhandle
 
 emits a palpable sense for the need to accommodate the burdens inherent in calculating the RMFP in depletion cases:
 

 It cannot be seriously disputed that it is impractical to go behind the Forms 2 in a comprehensive manner because this would require an unduly time-consuming and burdensome examination of all purchase contracts listed in the gas purchase sections of the forms. In this connection, it should be noted that during the trial the attorneys for both parties stated that if they had gone behind the forms to any greater extent than this [sic] had been done by defendant, “[w]e would never have tried this case.”
 

 Panhandle,
 
 408 F.2d at 704.
 

 Based on its context, we read
 
 Panhandle
 
 as creating a rebuttable presumption that filed annual reports constitute prima facie proof of the transactions they represent. Nonetheless, the parties remain free to rebut this presumption with proof that the forms conflict with the underlying contracts. Moreover, the parties remain free to disagree as to which FPC transactions should be included in the RMFP calculation.
 

 2
 

 In accordance with this approach, the Court of Federal Claims considered the transactions represented by the FPC Form 2 but rejected some which involved sale of gas after transportation. The court noted that the FPC Form 2 divides gas purchases by pipelines into two categories. Account 800 purchases are defined as wellhead purchases “where only the utility’s [the purchaser’s] facilities are used in bringing the gas from the well head into the utility’s natural gas system.” 18 C.F.R. part 201, account 800 (1974). In contrast, Account 801 purchases are defined as field line purchases “where facilities of the vendor or others are used in bringing the gas from the well head to the point of entry into the utility’s natural gas system.” 18 C.F.R. part 201, account 801 (1974). As the court explained, “[t]he distinction is that in Account 800 sales the
 
 purchaser
 
 transports the gas away from the wellhead; whereas in Account 801 sales, the
 
 producer
 
 transports the gas away from the wellhead.”
 

 Exxon’s data included both Account 800 and Account 801 sales. Because Account 801 sales include value added by transportation, and because Exxon’s study did not cleanse the Account 801 sales by subtracting the value added by transportation, we agree with the Court of Federal Claims that such sales should not play a role in the RMFP calculus in this case. Such transactions, however, should not necessarily be excluded altogether, especially in light of the goal of maximiz
 
 *845
 
 ing the number of transactions included.
 
 [8]
 
 Instead, it would be preferable for the taxpayer to cure these tainted transactions by subtracting the transportation cost from the sale price.
 
 Cf. Panhandle,
 
 408 F.2d at 718 (arriving at a price of $0.29/Mcf by subtracting $0.035 as transportation costs from the sale price of $0.325).
 

 In addition to Account 801 sales, Exxon also included in its calculation transactions where the gas was dehydrated and compressed prior to sale. This approach is reasonable, Exxon contends, because dehydration is an ordinary production activity as opposed to a manufacturing activity. In fact, Exxon asserts that dehydration by the producer is the rule rather than the exception; and the cost of dehydration, varying from $0.0025/Mcf to $0.005/Mcf, is quite small. Because it is easier and more economical for the producer to perform this task, the industry views dehydration as the producer’s responsibility. Exxon’s study, however, did not reduce the price of each sale by the applicable dehydration cost amount.
 

 The Court of Federal Claims rejected Exxon’s contention that dehydration sales should be included in the RMFP calculus. The court agreed with the government’s expert who testified that ordinary production methods are purely mechanical in nature whereas dehydration requires a chemical reaction. In addition, the court noted that some pipelines purchased gas prior to dehydration. Finally, the court recognized that excluding dehydration was consistent with the prior ease law which considered as comparable sales only those delivered to the purchaser at the wellhead or separater.
 
 Hugoton I,
 
 315 F.2d at 869;
 
 Panhandle,
 
 408 F.2d at 704;
 
 Shamrock Oil & Gas Corp. v. Commissioner,
 
 35 T.C. 979, 1036-37, 1961 WL 1273 (1961),
 
 aff'd,
 
 346 F.2d 377 (5th Cir.),
 
 cert. denied, 382
 
 U.S. 892, 86 S.Ct. 185, 15 L.Ed.2d 149 (1965). Based on the evidence, the court’s decision to exclude sales after dehydration from the RMFP calculus in this case is not clearly erroneous. As with the transportation costs, however, we note that it would be preferable, if possible, for the taxpayer to subtract the dehydration costs from the transactions rather than force the elimination of those transactions altogether.
 

 3
 

 Finally, Exxon contends that even if the Court of Federal Claims properly excluded certain transactions, the court failed in its obligation to determine an RMFP based on the remaining transactions. Exxon notes that in calculating its RMFP, Exxon was forced to make numerous decisions on issues such as market area, comparability, and which transactions to include. Given the nebulous character of these issues, Exxon explains, it was not implausible that the court would disagree with one or more of its decisions. To accommodate this possibility, Exxon’s price study provided the data in a manner that allowed the court to use only some of the transactions.
 

 The government does not argue that the remaining sales constituted an insufficient sample from which an RMFP could be calculated.
 
 See Hugoton II,
 
 349 F.2d at 420 (indicating that a sample containing twenty contracts is sufficient);
 
 cf. Panhandle,
 
 408 F.2d at 714-15 (suggesting that a sample containing only one transaction could be used to calculate the RMFP). Instead, the government argues that the
 
 remaining sales
 
 cannot be used to calculate an RMFP because: (1) Exxon’s sales data is not presented in a manner that allows the isolation of wellhead sales; and (2) the Account 800 sales reported on the FPC forms may not have been wellhead sales. We disagree with the government’s arguments.
 

 The government first contends that Exxon’s data cannot be parsed to reveal pre-dehydration Account 800 sales. On the record before us, however, it appears that Exxon’s study contains a list and description of each transaction included in its RMFP calculation. For example, Exhibit 45 is a list of pre-dehydration sales; and Exhibit 29 is a list of pre-compression sales, with the first three pages limited to Account 800 sales. The overlap between these two should yield pre-dehydration, pre-compression, Account
 
 *846
 
 800 sales. Therefore, the data presented by Exxon can be parsed to reveal pre-dehydration Account 800 sales.
 

 Next, the government contends that Account 800 transactions should not be used because they may contain field line purchases as well as wellhead purchases. In support, the government points to a “note” appearing under Account 800 which states that “[i]f gas purchases are made under one contract covering both well head and field line purchases and such amounts are not readily separable, the utility may classify such purchases according to predominant source or according to a reasonable estimate.” 18 C.F.R. Part 201, Account 800 (1974). As explained above, however, we presume that the FPC forms are representative of their underlying transactions. Either party may rebut this presumption with proof that some of the transactions listed in the forms are not representative.
 
 Cf. Panhandle,
 
 408 F.2d at 704 (allowing an adjustment because gas purchased at the wellhead was erroneously listed as non-wellhead sales). In the present case, however, the government has made no showing of proof to rebut the FPC transactions which meet the Court of Federal Claims’ criteria. Therefore, in the present case, the pre-dehydration transactions listed in Account 800 may properly be used to calculate the RMFP.
 

 In sum, the Court of Federal Claims properly rejected certain transactions in Exxon’s study because they did not represent wellhead sales. The court erred, however, by truncating its RMFP analysis thus not reaching the issue of whether Exxon’s study contained any valid transactions from which an RMFP could be determined. Nonetheless, we need not remand this case for calculation of the RMFP because the undisputed evidence of record supports an RMFP in the amount of $0.39/Mef.
 
 [9]
 

 Y
 

 The Court of Federal Claims stated that even if Exxon had proven its proffered
 
 *847
 
 RMFP, the court had authority to conduct an independent assessment of its reasonableness. While recognizing that the RMFP is not limited to actual gross income, the Court of Federal Claims decided that “the test, it seems to the court, is not whether the RMFP exceeds or is below the actual sales price of the gas but rather whether the RMFP is
 
 reasonable
 
 under the circumstances.” In support, the court relied on two factors. First, the statute provides for a “reasonable allowance for depletion ... according to the peculiar conditions in each case.” I.R.C. § 611(a). Second, the court found support in prior case law. We disagree that the court’s approach is appropriate.
 

 Section 611 indeed provides for “a reasonable allowance for depletion.” I.R.C. § 611(a). Importantly, however, the statute also provides that “such reasonable allowance in all cases [is] to be made under regulations prescribed by the Secretary or his delegate.”
 
 Id.
 
 We do not read this broad directive as allowing the courts to adjudicate the reasonableness of an allowance on a case-by-case basis. Instead, the statute directs the Secretary to promulgate regulations which will apply
 
 in all cases
 
 to yield a reasonable allowance. Pursuant to this directive, the Secretary has promulgated Treas. Reg. § 1.613-3(a), which remains of unquestioned validity.
 
 See Hugoton I,
 
 315 F.2d at 871. Because Congress has charged the Secretary with the task of promulgating regulations which yield a reasonable allowance, we hold that a depletion allowance pursuant to Treas. Reg. § 1.613-3(a) is per se reasonable, absent a challenge to the regulation itself.
 

 Our reasoning is similar to that of the United States Supreme Court in
 
 Commissioner v. Portland Cement Co. of Utah,
 
 450 U.S. 156, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981), a ease which also involved Treasury Regulations for depletion allowances. The Court explained its basis for applying the Treasury Regulations at issue in that case as follows:
 

 These regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task “of administering the tax laws of the Nation.” ... Treasury Regulations “must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.” Indeed, our customary deference to Treasury Regulations is particularly appropriate in this case, for the Court previously has recognized the necessity of a “broad rule-making delegation” of authority in the area of depletion----
 

 Id.
 
 at 169, 101 S.Ct. at 1045-46 (citations omitted). This ease demonstrates that the Secretary is charged with promulgating regulations and our scope of review is limited to the reasonableness of the regulations and not the reasonableness of any individual allowance.
 

 In support for its approach, the Court of Federal Claims also relied on the statutory language that the reasonable allowance be made “according to the peculiar conditions in each case.” I.R.C. § 611(a). This, the court stated, supported a case-by-case inquiry into the reasonableness of a particular allowance. This interpretation, however, has been rejected by the Supreme Court. The Court has explicitly explained that “[r]ead in context, ‘in each ease’ refers to the different types of depletable resource [e.g., mines, oil and gas, timber, etc.], not to individual taxpayers.”
 
 Portland Cement,
 
 450 U.S. at 171 n. 20, 101 S.Ct. at 1046-47 n. 20. Therefore, the statutory language does not support the Court of Federal Claim’s case-by-case reasonableness inquiry.
 

 The Court of Federal Claims also stated that
 
 Panhandle
 
 and
 
 Henderson Clay
 
 stand for the proposition that the RMFP must be reasonable. We disagree. As explained above, in each of those cases, the court decided that the proffered price was not representative.
 
 See Panhandle, 408 F.2d
 
 at 716;
 
 Henderson Clay,
 
 324 F.2d at 15. In other words, a
 
 representative
 
 market or field price, i.e., RMFP, had not been established. If an RMFP is proven, however, nothing in prior case law requires the court to conduct an independent reasonableness inquiry.
 
 [10]
 

 
 *848
 
 In sum, neither the statutory language nor prior case law allows, let alone requires, the Court of Federal Claims to conduct an independent reasonableness inquiry once an RMFP has been established.
 

 VI
 

 We conclude that prior case law does not preclude an RMFP that exceeds actual gross receipts. This is consistent with the statutory scheme which delegates to the Secretary of the Treasury the authority to promulgate regulations that provide for a reasonable depletion allowance. Pursuant to this authority, the Secretary promulgated Treas. Reg. § 1.613-3(a), which is the only regulation that applies to integrated natural gas producers. Although the Court of Federal Claims was correct in deciding that there is no express limit on the RMFP, we conclude that the court erred by engaging in a reasonableness inquiry. If an RMFP is established, it must govern.
 

 Finally, although the court properly rejected certain transactions included in Exxon’s RMFP calculation, the court erred by failing to conclude that Exxon’s study contained qualifying transactions from which a valid RMFP could be calculated. The decision of the Court of Federal Claims is therefore reversed. The record supports an RMFP of $0.39/Mcf, and Exxon is entitled to use that figure in calculating its depletion deduction for the period in question. Because we conclude that Exxon is entitled to an RMFP of $0.39/Mcf, rather than of $0.36/Mcf “field price” as originally claimed, we remand the case to the Court of Federal Claims for entry of a final decision consistent with our conclusion.
 

 REVERSE AND REMAND.
 

 [1]
 

 . This price included extraction, processing, and transportation by Exxon.
 

 [2]
 

 . Both the "field price" and the RMFP represent the constructive gross income on a per unit basis. As a result, the constructive gross income equals the RMFP or "field price” multiplied by the volume of gas produced.
 

 [3]
 

 . Unless otherwise noted, all cites to the I.R.C. refer to the 1974 version.
 

 [4]
 

 . Unless otherwise noted, all cites to treasury regulations refer to the 1974 versions of those regulations.
 

 [5]
 

 . The court referred to the plaintiff's approach as the "market comparison approach,” which is equivalent to the RMFP approach. The RMFP approach is a means of disintegrating an integrated producer back into its separate extracting and processing/transporting entities.
 
 Henderson Clay,
 
 324 F.2d at 15. Under the RMFP approach, the constructive gross income is that which the hypothetical extracting company would receive for sale of its products to its processing/transporting alter ego.
 
 Id.
 

 [6]
 

 . Under the proportionate profits method, the gross income from the property is calculated by taking the gross income from the sale of the processed gas and subtracting costs attributable to gathering and processing the gas.
 
 Hugoton I,
 
 315 F.2d at 870.
 

 [7]
 

 . On average, the RMFP "will tend to equalize the depletion allowance as between integrated and nonintegrated producers.”
 
 Hugoton
 
 7, 315 F.2d at 876. Any nonintegrated producers locked into long term contracts will be included in the RMFP calculus and will tend to lower the RMFP. On the other hand, nonintegrated producers selling at current market prices will tend to raise the RMFP.
 

 [8]
 

 . In the present case, the evidence indicates that 723 of the 2,228 transactions represented Account 800 sales. Thus, eliminating Account 801 sales altogether would reduce the sample set by 68 per cent.
 

 [9]
 

 . The first three pages of Exhibit 29 fist pre-compression Account 800 sales. Exhibit 45 lists, in decreasing order of volume, all transactions in which the seller does not dehydrate the gas. Those transactions which appear on both of these lists satisfy the Court of Federal Claims’ criteria for wellhead sales. These qualifying transactions are summarized below, in decreasing order of volume purchased:
 

 [[Image here]]
 

 The total price for these transactions is approximately $11,260,653. This is derived by multiplying the volume of each transaction by the price for that transaction, and summing the resulting figures for all transactions. The volume weighted average price is derived by dividing this total price of $11,260,653 by the total volume of 28,690,351 Mcf. This results in a volume weighted average price of $0.39/Mcf.
 

 [10]
 

 . Whether a price is representative depends simply on an objective evaluation of the price being obtained by nonintegrated producers. In contrast, the determination of whether a price is reasonable can depend on numerous factors in-
 
 *848
 
 eluding notions of fairness, the taxpayer’s profit margin, etc.